UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CYNARA CIRAULO,            )
          Plaintiff,      )
                          )
      v.                  )
                          )   C.A. No. 16-cv-30181-MAP
CAROLYN W. COLVIN,        )
Commissioner of Social    )
Security Administration,  )
          Defendant.      )
                          )
                          )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER
AFFIRMING DECISION OF COMMISSIONER
(Dkt. Nos. 17 and 22)

March 14, 2018

PONSOR, U.S.D.J.

                I.   INTRODUCTION

     Plaintiff Cynara Ciraulo has applied for Social

Security Disability Insurance benefits (DIB) and

Supplemental Security Income benefits, alleging disability

due to various physical impairments dating from August 6,

2012.  Her initial application and petition for

reconsideration were denied.  A hearing before

Administrative Law Judge (ALJ) Kim Griswold took place on January 6, 2015. After considering all the evidence, a second ALJ, Addison Massengill, issued a decision dated June 26, 2015, concluding that Plaintiff was not disabled.[1] Plaintiff seeks to have the unfavorable finding reversed and moves for judgment on the pleadings. In response, Defendant has moved to affirm the final decision of the Commissioner. For the reasons laid out below, Plaintiff's motion will be allowed and Defendant's denied.

## II.  FACTUAL BACKGROUND

At the time of her initial application, Plaintiff was a 27-year old female claiming disability due to chronic pain, hydronephrosis of the left kidney, an undiagnosed muscle condition, muscle spasm, and severe muscle tension. She has a high school education and a Bachelor of Science degree.

---

[1]  According to the Manual on Hearings, Appeals, and Litigation Law (HALLEX) published by the Social Security Administration's Office of Disability Adjudication and Review (ODAR), a case may be reassigned where an ALJ who has conducted a hearing is "unavailable" to render a decision for one of various reasons. (HALLEX I-2-8-40-a.)  That apparently occurred in this case. For simplicity's sake, unless otherwise noted, this memorandum will use the term "the ALJ" to refer to ALJ Massengill, who authored the decision.

Plaintiff has worked as a parking lot attendant, medical records clerk, and a camp counselor. Plaintiff lives mainly with her parents, but visits her husband in Kentucky every several months, where she stays for a month. All citations are to the Social Security Administration's Administrative Record of Social Security Proceedings ("A.R.") (Dkt. No. 16).

A.   Medical Background

Plaintiff has a complex medical history, including asthma, chronic pain, chronic laryngitis, bilateral kidney issues, and frequent visits to emergency rooms for primary care.  (A.R. 418-525, 606-07.)

In August 2011, Plaintiff underwent ureteropelvic junction surgery with pyeloplasty to remove a blockage in her left kidney.  (A.R. 555, 584.)  She subsequently had a right pyeloplasty in February 2012 and cystoscopy and bilateral retrograde pyelogram with stent placement in August 2012.  (A.R. 555-56, 916-17.)  In October and November 2012, Plaintiff underwent a thoracic epidural steroid injection in her left flank.  (A.R. 557-59, 562-63.)

In December 2012, Plaintiff presented to the Albany Medical Center Hospital emergency room complaining of flank pain for which she had had multiple interventions, including ureteral stent placement and nephrostomy tubes placed on the left side, without any significant reduction in pain. (A.R. 584.) An ultrasound revealed left mild-to-moderate hydronephrosis. (A.R. 584, 603.)

In January 2013, Plaintiff visited Brian Banker, M.D., complaining of a sinus infection, difficulty breathing, and nausea. (A.R. 608.) Dr. Banker treated Plaintiff for acute bacterial sinusitis and refilled her Albuterol. (A.R. 609.) That same month, Plaintiff visited Spencer L. Haller, M.D., reporting urological concerns and back pain; Dr. Haller renewed her prescription for oxydocone. (A.R. 682-84.)

In February 2013, Plaintiff continued to report back pain to Dr. Haller as well ongoing flank pain, swelling and pain in her fingers and neck, trouble sleeping, heartburn, and mild ankle swelling. (A.R. 680.) Dr. Haller ordered MRI testing of the spine and a bilateral renal ultrasound. (A.R. 682.) The MRI of the thoracic spine showed minimal discogenic degenerative changes with no focal signal

abnormalities in the spinal cord or focal disc herniation or spinal cord compression at any level. (A.R. 611.) The MRI of the lumbar spine showed minimal bulging of the L5-S1 disc. (A.R. 612.) The renal ultrasound revealed "bilateral pelvocaliectasis left greater than right." (A.R. 613.)

In March 2013, Plaintiff visited the Mercy Medical Center emergency room complaining of flank pain occurring every few months. (A.R. 615.) Her physical examination was normal except for paraspinal muscle tenderness. (A.R. 616-17.) An x-ray was unremarkable. (A.R. 618.) The physician recommended Plaintiff take Dilaudid if her pain worsened. (Id.) The same month, Plaintiff presented to Jeffrey G. Mulhern, M.D. for further evaluation of her left flank pain and urological concerns. (A.R. 606-07.) Dr. Mulhern noted that Plaintiff reported constant pain, mainly on her left flank. (A.R. 607.) He noted that the physical examination was remarkable for blood pressure, which he reported as 128/75. He told Plaintiff he did not believe there was an active issue regarding kidney function and recommended Plaintiff speak to her urologist. (Id.)

In May 2013, Plaintiff presented to the emergency room with complaints of left leg pain, numbness, hoarseness, muscle pain, and sleep problems. (A.R. 626.) On examination, Plaintiff had normal range of motion in her back and "sock like numbness and delayed hyperesthesia of [the] left lower leg and foot in a sock-like distribution." (A.R. 628.) The differential diagnosis included chronic pain, conversion, fibromyalgia, and multiple sclerosis; she was discharged in stable condition. (Id.)

That same month, Plaintiff reported to Dr. Haller that she was having "ascending pain that went up to her shoulder and now into her neck, and also started to go down her legs." (A.R. 672.) Plaintiff's physical examination was normal except for diffuse tenderness to palpation in her back and extremities. (A.R. 673.) Dr. Haller said that Plaintiff's diffuse pain was of unclear etiology and recommended a neurological evaluation and brain and cervical spine MRIs. (A.R. 674.)

At the end of August 2013, Plaintiff met with Dr. Haller. She was assessed with chronic back pain, dysuria, and central pain syndrome. (A.R. 666.)

The next month, Plaintiff presented to Dr. Haller with complaints of chronic pain in her back, calves, thighs, head, neck, shoulders, and legs. She reported tingling, numbness, and muscle spasms in her legs, and tics in her legs and hands as well as elbow pain and pain in her left knee, hip, and ankle. (A.R. 660.) Her physical examination was normal except for mild back pain to palpation on the left straight-leg raise. Plaintiff's diagnoses included mild, intermittent asthma; chronic back pain; and ureteropelvic junction obstruction. Dr. Haller noted that "fibromyalgia has been questioned but I'm not certain given some of her neurologic symptoms." (A.R. 663.)

In October 2013, Plaintiff presented to Lahey Clinic Medical Center for a preoperative visit ahead of vocal cord surgery. She reported suffering from urological concerns, chronic pain, asthma, hay fever, gastroesophageal reflux, muscle pain and weakness, and swelling in her legs, more on the left than right. (A.R. 689.) Treatment notes stated that Plaintiff was being treated by "neurology who continue to follow her, considering fibromyalgia at this time."

(A.R. 689.)  Plaintiff denied musculoskeletal concerns and said her asthma, hay fever, and gastrointestinal reflux were controlled with medication.  (A.R. 691.)  Plaintiff said she was able to climb two flights of stairs without symptoms. (A.R. 692.)

That same month, Plaintiff was examined by neurologist Kinan Hreib, M.D.  The exam was normal as to motor and sensory function.  (A.R. 745.)  He assessed "[p]ain without a neurological explanation . . . with a possible diagnosis of fibromyalgia."  (A.R. 730).

In December 2013, Plaintiff told Dr. Haller that she had continued back pain and toe problems.  (A.R. 1046.) Plaintiff's examination was essentially normal except for mild erythema (reddening of the skin) and swelling in her right toe.  (A.R. 1048.)

The same month, Plaintiff visited rheumatologist Matthew Axelrod, M.D. of the Lahey Clinic with complaints of a hoarse voice, sore throat, and radiating left flank pain. Dr. Axelrod noted that Plaintiff's "initial flank pain improved but she has been left with long standing flank and muscle pain on the left side."  He also noted that Plaintiff

had been told she had fibromyalgia.  (A.R. 1128.)  On
physical examination, Plaintiff had tenderness at the left
greater trochanter (hip joint) with palpation as well as
diffusely tender muscles but no weakness and full range of
motion and motor strength.  (A.R. 1129.)  Dr. Axelrod
assessed chronic pain and administered a Depo-Medrol and
lidocaine injection in her left hip.  (A.R. 1130.)

Later that month, Plaintiff visited Dr. Hreib with
reports of chronic pain and involuntary movements in her
hands.  Plaintiff said Gabapentin had "reduced the pain by
75%."  (A.R. 1122.)  On examination, Dr. Hreib noted that
Plaintiff had no tremors, myoclonus (muscle contractions),
or focal weakness; her gait was normal.  The doctor did not
observe any involuntary movements.  (A.R. 1124.)

In February 2014, Plaintiff visited Priya Shastri,
M.D., a Lahey Clinic neurologist, with complaints of
involuntary motor movements for the past eight to nine
months.  Plaintiff said although Gabapentin helped with the
pain, it did not with the movements.  (A.R. 1102.)
Plaintiff's musculoskeletal and neurological examinations

were normal.  (A.R. 1103.)  Dr. Shastri made similar findings in May 2014 and July 2014.  (A.R. 1079, 1088-89.)

A physical examination conducted by Dr. Axelrod on March 7, 2014, showed muscle tenderness but no weakness or limitations in range of motion.  (A.R. 1100.)  Dr. Axelrod assessed swelling in the larynx, diffuse pain, and "symptoms that sound like inflammatory back pain."  (A.R. 1101.)  Dr. Axelrod administered an injection of Depo-Medrol and lidocaine.  (Id.)

Plaintiff underwent an x-ray and an MRI of the pelvic joints in March 2014. The x-ray revealed no acute bone or joint abnormality, while the MRI demonstrated mild bilateral sacroiliitis.  (A.R. 1097, 1098.)  That same month, Plaintiff reported continued problems with hoarse voice and back pain.  (A.R. 1099.)  On April 15, 2014, Dr. Axelrod noted that the MRI had shown bilateral sacroiliitis and spondyloarthropathy, and stated that he felt this was "likely anky[l]osing spondylitis."[2]  (A.R. 1094.)  Follow-up

---

[2]  "Ankylosing spondylitis" is a form of arthritis that causes inflammation in the joints of the spine and vertebrae. In severe cases, the arthritis will deteriorate the joints, causing the vertebrae to fuse together and limit mobility in that section of the spine. There is no known

visits on July 8, and October 15, 2014, showed the same symptoms. (A.R. 1076, 1082, 1093.) During an April 2014 visit, Dr. Haller also assessed ankylosing spondylitis. (A.R. 1043, 1094.)

In May 2014, Plaintiff underwent a routine gynecological examination. (A.R. 1032.) Plaintiff reported no gynecological concerns and denied chest pain, leg swelling, palpitations, back pain, joint pain or swelling, muscle pain, headaches, cough, wheezing, neck pain, or significant swelling. (A.R. 1032-33.)

In August 2014, Plaintiff visited Robert Stewart, M.D., with complaints of right upper quadrant pain, back pain, joint pain and swelling, and abdominal pain. (A.R. 1198-99.) Plaintiff denied difficulty walking, headaches, chest pain, or swelling of her feet, ankles or hands. (A.R. 1199.)

cure, and treatment aims instead to reduce pain and increase mobility. "Spondylosis" is a broader term, referring to degenerative age-related conditions affecting the spine, which can lead to severe and chronic pain in the back and extremities. Although Plaintiff's Memorandum claims that she suffers from "ankylosing spondylosis," (Dkt. No. 18 at 3), her testimony at the hearing and the medical records all indicate a diagnosis of the former condition, "ankylosing spondylitis." This memorandum assumes Plaintiff intends to refer to the condition as described in the records and testimony.

Plaintiff's neurological examination was normal, and her musculoskeletal examination revealed no generalized swelling or edema of extremities and normal coordination. (A.R. 1200.)

In September 2014, Plaintiff presented at Saints Mary and Elizabeth Hospital complaining of acute flank pain. Gallbladder stones were assessed, and Plaintiff underwent gallbladder removal surgery that month. (A.R. 1177.)

In October 2014, Plaintiff complained to Dr. Haller of headaches, sleep problems, and chest pain. (A.R. 1023.) Plaintiff's physical examination was normal. Dr. Haller assessed fatigue, insomnia, chronic back pain, shortness of breath, and chest pressure. (A.R. 1025.) A chest x-ray was normal. (A.R. 1050.)

In January 2015, Plaintiff again visited Dr. Axelrod complaining of continued back pain. (A.R. 1227.) On examination, Plaintiff had tenderness at the left greater trochanter with palpation as well as diffusely tender muscles with no weakness. She again showed a full range of motion with no synovitis (inflammation of the membrane that lines certain joints) and full motor strength. Dr. Axelrod

noted that she had failed to respond to Enbrel and assessed ankylosing spondylitis. (A.R. 1229.)

On February 4, 2015, Plaintiff visited Dr. Haller, complaining of pain in her left knee and in both her ears. Dr. Haller recommended that she follow up with an ENT for the latter symptoms. With regard to her knee, he assessed a possible meniscal tear, or Baker cyst, and recommended that she "discuss with her rheumatologist about whether they'd be wanting to drain this." (A.R. 1244.) Dr. Haller also noted that these "symptoms are less likely to be related to her recent change in medication for ankylosing spondylitis." (Id.) An ultrasound of the left knee on February 20, 2015 showed no abnormalities. (A.R. 1245.)

B. Expert Opinions

In July 2013, Robert B. McGan, M.D., a state agency consultant, said the medical records showed that Plaintiff could perform a range of light work, with occasional postural and environmental limitations. (A.R. 113-15.) In December 2013, a second state agency consultant, Lewis

Cylus, M.D., agreed with Dr. McGan's assessment.  (A.R. 124-26.)

On December 22, 2014, Dr. Axelrod completed a "Medical Opinion Questionnaire Regarding Ability to Do Work-Related Activities," outlining Plaintiff's physical health impairments and relating limitations.  (A.R. 1061.)  Dr. Axelrod opined that Plaintiff's maximum ability to lift and carry weight, whether on an occasional or a frequent basis, was less than ten pounds (the lowest category).  (A.R. 1061.)  Plaintiff could stand and walk less than two hours in an eight-hour workday and sit less than two hours during an eight-hour workday.  (Id.)  Dr. Axelrod indicated that Plaintiff would need to alternate sitting, standing or walking to relieve discomfort.  She could sit for five minutes before changing position, and she needed to walk around every twenty minutes for five minutes at a time. (Id.)  Further, Plaintiff would need an opportunity to shift at will from sitting to standing/walking and would need to lie down at unpredictable intervals during an eight-hour working shift.  This necessity would arise "every 2 hours." (Id.)  Dr. Axelrod further indicated that the findings that supported these limitations included "[a]nkylosing

spondylitis confirmed on MRI at our institution" as well as "painful tender joints" detected in Plaintiff's hands, wrists, hips, knees, and ankles. (Id.) As confirmed by MRI, Plaintiff could "never" twist, stoop/bend, crouch, climb ladders and climb stairs. (A.R. 1225.) Further, reaching, fingering (fine manipulation), and pushing/pulling were affected by Plaintiff's impairments as these caused "pain, stiffness, fatigue, swelling." (Id.) Finally, Dr. Axelrod opined that Plaintiff's impairment or treatment of those impairments would cause her to be absent from work "more than four days per month." (Id.) This questionnaire was updated on January 9, 2015. (A.R. 1224-25.)

## C.    Application, Appeal, and Hearing

On March 13, 2013, Plaintiff filed her application for Social Security Disability Benefits under Title II of the Social Security Act. The application was denied on July 18, 2013, and again denied on reconsideration on December 4, 2013. Plaintiff filed a timely request for a hearing with an ALJ on January 22, 2014. Plaintiff obtained counsel, who represented her at the ALJ hearing, as well as in this

current action.  On January 6, 2015, Plaintiff appeared with counsel at a hearing before ALJ Kim Griswold.

At the hearing, Plaintiff testified that she was disabled due to various physical impairments, including ankylosing spondylitis, which caused pain and inflammation of the joints, especially her hips and legs.  (A.R. 79, 81, 93.)  She reported taking Humira every other week for a trial period in an effort to treat her ankylosing spondylitis; this medication, however, caused her joint pain to increase and caused fatigue.  (A.R. 80.)  Plaintiff testified that she had been recently diagnosed with fibromyalgia that caused chronic pain.  (A.R. 91.)  She reported suffering from chronic asthma and allergies as well as kidney problems.  (A.R. 96, 89.)  She described having undergone surgeries on each kidney, and that she suffered from chronic kidney pain.  (A.R. 89.)  She also reported chronic laryngitis that started suddenly two years ago, for which she had undergone Botox injection treatments without any success.  (A.R. 96.)

Plaintiff described taking medications for her various ailments.  These medications reportedly caused her side

effects, including dry mouth, drowsiness, dizziness, fatigue, increased joint pain, and paranoia. (A.R. 80-81, 92-93.) Plaintiff noted that she used a cane for balance and stability as she had fallen in the past. (A.R. 82-83.)

Plaintiff reported that her physical limitations affected her sleep and daily living activities, including her abilities to bend and sit for extended periods, as well as her concentration. (A.R. 93.) She noted that she often sat in a lounging position with her legs elevated in order to be comfortable: "[m]y legs are always up, if possible." (A.R. 94.) Plaintiff stated that she could sit for thirty minutes comfortably, stand five minutes comfortably, and walk less than a block comfortably. (A.R. 93-94.) She reported having problems with her hands, dropping things and needing help with opening jars and bottles. (A.R. 94.) Plaintiff indicated that some nights she could not sleep and other nights she would sleep for extended periods of time. She stated that she had been falling asleep without warning and, as a result, was undergoing a sleep study for further evaluation. (A.R. 95.) She also stated that she

experienced difficulty concentrating, "forget[s] a lot" and "tend[s] to repeat [her]self." (A.R. 97.)  She noted that on particularly bad days, she "move[s] to the recliner," and if she overexerted herself she had "to take a few days to recover."    (A.R. 97-98.)

Plaintiff testified that she lived most of the time with her parents and lived with her husband, who was stationed at Fort Knox, Kentucky, every three to four months for one month at a time.  (A.R. 83.)  Plaintiff stated that she had not driven for over a year, and that her parents scheduled her medical appointments so they could bring her to appointments.  (A.R. 84, 88.)  According to Plaintiff, her parents cooked and performed household chores, but Plaintiff would help put away the dishes and make simple meals, such as cereal or a sandwich for herself.  (A.R. 87-88.)  Plaintiff explained that, when she flew to Kentucky to see her husband, she wore a mask on the plane and utilized a wheelchair to get on and off the plane.  (A.R. 98.)  She reported that her husband cooked and performed the household chores but Plaintiff would help fold laundry.  (A.R. 85-86.)

Also at the hearing, a vocational expert, Horton Golds,

testified as to the exertional level of Plaintiff's past
work.  He classified her work as a parking lot attendant as
light exertional level but sedentary as performed; as a
medical records clerk, light exertional level but medium as
performed; and as a camp counselor, light exertional level
but medium as performed.  (A.R. 100-01.)

The ALJ then posed a series of hypotheticals to Golds
involving a claimant of the same age, educational
background, and work experience as Plaintiff.  In the first,
the hypothetical claimant suffered from the following
limitations:

> . . . [t]hey can occasionally crouch, crawl, kneel,
> balance, and climb ramps and stairs.  They cannot climb
> stairs, ladders, ropes, or scaffolds; and they have no
> limits on stooping . . . . They can tolerate occasional
> exposure to extreme cold, extreme heat, humidity, dust,
> fumes, odors, gases, poor ventilation, and hazards such
> as dangerous moving machinery and unprotected heights.
> They can conduct normal conversation in the routine
> work setting, but cannot perform telephone work more
> than occasionally.  They may use the cane to ambulate
> longer distances outside the home over one block.

(A.R. 101-102.)  Golds stated that such a person would be
able to perform Plaintiff's past work as a parking lot
attendant and as a medical records clerk.  (A.R. 102.)  In a

second hypothetical, the ALJ added the following
limitations:

> . . . [t]hey can occasionally climb ramps and stairs.
> They can't crouch, crawl, kneel, balance, or climb
> ladders, ropes or scaffolds with any measurable
> regularity.  They have no limits on stooping . . . .
> They can still conduct normal conversation in the
> routine work setting, but cannot perform telephone work
> more than occasionally.  And due to pain medication,
> they can understand, remember and carry out simple
> instructions throughout an ordinary work day and work
> week, with normal breaks, on a sustained basis.

(A.R. 103-04.)  Golds testified that Plaintiff could perform

her past work as a parking lot attendant, as well as other

unskilled occupations such as work as a cashier, small parts

assembler, and a hand packager.  (A.R. 104-05.)

A third hypothetical assuming all of the same

limitations added the limitation of using a cane to ambulate

for longer distances outside the home.  Asked whether use of

the cane would affect her ability to perform these

occupations, Golds said no.  (A.R. 106.)

Finally, hypotheticals four and five concerned,

respectively, an individual who needed to be absent from

work at least twice a month on a sustained basis, and an

individual who took an hour off per day for rest or pain

control.  Golds stated that neither behavior would be tolerated in the workplace.  (A.R. 106.)

On June 26, 2015, ALJ Massengill, stepping in for ALJ Griswold, issued an unfavorable decision, finding that Plaintiff was not disabled.  Plaintiff appealed this decision on August 17, 2015.  Between July 2015 and February 2016, Plaintiff made several supplemental submissions to the Appeals Council of medical records from this period.  (Dkt. Nos. 16-2 at 8, 10, and 43; 16-14 at 178; and 16-15.)  These records attest to diagnoses of fibromyalgia, ankylosing spondylitis, several further kidney surgeries, and other conditions.  In an Order dated September 13, 2016, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, holding that because the supplemental records concerned Plaintiff's health at a "later time" than that covered by the ALJ's decision, they did not bear upon that decision.  (Dkt. No. 16-2 at 3.)  Thus, the ALJ's decision became final and subject to judicial review.

On November 10, 2016, Plaintiff filed this complaint seeking reversal of this decision.

21

## III.  DISCUSSION

An individual seeking Social Security disability benefits must prove inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step sequential process to evaluate disability claims.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  This process requires making the following determinations: (1) whether the claimant is engaged in substantial gainful activity; if not, (2) whether she has a severe impairment; if so, (3) whether the impairment meets or equals an entry in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App'x 1; if not, (4) whether her residual functional capacity (RFC) allows her to perform any of her past relevant work; and, if not, (5) whether she can adjust to other work.  See 20 C.F.R. § 404.1520(a)(4)(i)-(v).  An individual can adjust to other work if she can do jobs that "exist in significant numbers in the national economy."  Id. at § 404.1560(c)(1).

A.  ALJ's Decision

22

The ALJ followed the five-step sequential disability determination.  At step one, he determined that Plaintiff had not been engaged in substantial gainful activity since August 6, 2012, the date of her alleged disability onset. (A.R. 54.)  At step two, he found that Plaintiff had the severe impairments of ankylosing spondylosis[3], inflammatory arthropathy, overweight to obese, rule out fibromyalgia, persistent hoarse voice, and congenital kidney disease, id. at § 404.1420(c).  (A.R. 54.)

At step three, the ALJ found that Plaintiff's impairment, specifically her congenital kidney disease, did not meet or medically equal an entry on the List of Impairments.  The ALJ concluded that Plaintiff's kidney disease "was essentially stable, but, nonetheless, finds it is a severe impairment."  (Id.)  The ALJ did not discuss the severity of Plaintiff's ankylosing spondylitis, but concluded, based upon a February 21, 2013, MRI of

_____

[3] In listing Plaintiff's impairments, the ALJ noted "ankylosing spondylosis," although a few paragraphs later, in describing Plaintiff's medical history, he referred to "ankylosing spondylitis."  (Dkt. No. 16-2 at 54.)  Because there is significant difference between the two, the court will conclude this is error.

Plaintiff's spine, that Plaintiff's thoracic discogenic changes and bulging "imposed no more than minimal impairment." (A.R. 56.)

Proceeding to step four, the ALJ found that Plaintiff had a residual functional capacity (RFC) to perform light work. In discussing the evidence, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning these symptoms are not entirely credible for multiple reasons." (A.R. 57.) These were, first, that although Plaintiff reported using a cane, this did not appear to be medically prescribed. Second,

> while Plaintiff testified to suffering significant pain, as well as maintained an extensive diary of symptoms, the objective evidence of record (as outlined below) fails to fully support her allegations. Additionally, [Plaintiff] is able to travel to visit her husband, as well as engage in some activities of daily living including simple meal preparation and some shopping.

(A.R. 58.)

The ALJ gave "little weight to the opinions of Dr. Axelrod" offered in the December 2014 and January 2015 questionnaires, determining that these were "not consistent

with the objective findings, including the clinical exams by Dr. Axelrod." (A.R. 61.) The ALJ noted that treatment notes from Dr. Axelrod showed findings of "diffusely tender muscles, with no weakness and 5/5 strength." (Id.) Assessing Plaintiff's RFC to perform light work, the ALJ differed from Dr. Axelrod in concluding that "[Plaintiff] is limited to occasional climbing of ramps and stairs . . . . She has no limitations on stooping . . . . She can tolerate occasional exposure to extreme heat, extreme cold, humidity, dust, fumes, odors, gases, poor ventilation and hazards . . . ." (A.R. 57.) Dr. Axelrod's assessment had specified that Plaintiff could never climb ramps or stairs, could never stoop, and was to avoid all exposure to cold, humidity, dust, fumes, odors, gases, poor ventilation and hazards, although she could tolerate occasional exposure to extreme heat. (A.R. 1225.)

Finally, at step five, the ALJ determined that there were a significant number of jobs in the local and national economies that Plaintiff could perform, such as a cashier,

small parts assembler, or hand packager.  Thus, the ALJ
found that Plaintiff was not disabled.

B.   <u>Plaintiff's Objections to the ALJ's Determination</u>

     Plaintiff argues, first, that the ALJ erred in
rejecting the opinion of Dr. Axelrod, Plaintiff's treating
rheumatologist.  The Code of Federal Regulations, 20 C.F.R.
§§ 404.1527(c)(2) and 416.927(d)(2), requires an ALJ to give
more weight to a treating physician's opinion "since these
sources are likely to be the medical professionals most able
to provide a detailed, longitudinal picture" of the
patient's medical condition.  An ALJ must give "substantial
weight to the evidence and opinion of the claimant's
treating physician, unless good cause is shown for
rejecting."  <u>Washington v. Shalala</u>, 37 F.3d 1437, 1440 (10th
Cir. 1994) (quotation marks omitted).  Controlling weight is
given if the "treating source's opinion on the issue(s) of
the nature and severity [of the patient's] impairment(s) is
well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent
with the other substantial evidence."  20 C.F.R. §§
404.1527(c)(2) & 416.927(c)(2).

Plaintiff insists that Dr. Axelrod's conclusions are not lacking foundation, given that she carries several diagnoses, including fibromyalgia. Fibromyalgia is typically diagnosed through a patient's "report of complaints, or history," the only objective signs for which are "trigger points," symptoms which the Plaintiff described at her hearing. Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009) (quotation omitted).

Second, Plaintiff argues that the ALJ erred in presenting the vocational expert with hypotheticals that contained RFC limitations materially less restrictive than those listed in the decision. Although expert testimony may be the foundation of a well-reasoned decision, that testimony is only relevant to the extent that ALJ's questions are consistent with the record. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). The ALJ presumed in the first hypothetical that the individual could "tolerate occasional exposure to extreme heat, extreme cold, humidity, dust, fumes, odors, gases, poor ventilation, and hazards," but left out this capacity

in the second and third hypotheticals.  Nevertheless, the RFC relied upon in the ALJ's decision, which is based on the second and third hypotheticals, assumed that Plaintiff was able to tolerate "extreme heat . . ." etc.  (Dkt. No. 18 at 18.)

The inconsistency, Plaintiff argues, was obviously significant.  See Warren v. Astrue, Civ. No. 10-30053, 2011 WL 31292 (D. Mass. Jan. 4, 2011) (distinguishing between a typographical error, which was held not to warrant remand, and a hypothetical failing to include all certain limitations, warranting remand).  See also, Slovak v. Barnhart, No. Civ. 02-231-M, 2003 WL 21246049, at *7 (D.N.H. May 9, 2003); Mead v. Barnhart, No. Civ. 04-139-JD, 2004 WL 2580744 (D.N.H. Nov. 15, 2004) (finding, in both cases, that remand was appropriate where an ALJ's hypotheticals contained a less-restrictive limitation on physical activity than stated in the findings-of-fact); Young v. Astrue, 771 F.Supp 2d 610, 622-23 (S.D.W. Va. 2011) ("[F]or a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments.").

C.  Defendant's Arguments in Support of ALJ's Decision

     Defendant points out that, even where there is some
support for an alternative decision in the record, the
Secretary's decision must stand if it is supported by
substantial evidence.  Evangelista v. Sec'y of Health &
Human Servs., 826 F.2d 136, 144 (1st Cir. 1996).  Defendant
argues that the ALJ's decision is supported by substantial
evidence.  Frustaglia v. Sec'y of Health & Human Servs., 829
F.2d 192, 195 (1st Cir. 1987) (upholding Secretary's
findings where "their adequacy is supported by substantial
evidence").

     First, Defendant argues that the ALJ properly afforded
Dr. Axelrod's opinion little weight because it was not
consistent with the objective findings, including the
doctor's own clinical examinations.  While Dr. Axelrod
concluded that Plaintiff could not sit, stand, or walk for
more than two hours, his physical examinations, Defendant
says, consistently revealed only diffusely tender muscles.
Plaintiff also had full range of motion.  (A.R. 1076, 1082,
1093, 1100, 1129, 1229.)  According to Defendant, diagnostic

testing revealed few significant impairments.  (A.R. 611-12, 1072-73, 1098, 1117-20.)  Further, Plaintiff often denied back pain, neck pain, muscle pain, and joint pain or swelling.  (A.R. 622, 926, 1033, 1044, 1278.)  In addition, in December 2013, Plaintiff told Dr. Hreib that Gabapentin was helpful and had "reduced the pain by 75%."  (A.R. 1122.)

Second, Defendant argues that the possibility of a diagnosis of fibromyalgia did not undermine the ALJ's decision.  Defendant points to evidence suggesting that, at the time of the application and hearing, Plaintiff's claim to suffer from the disease was speculative.  See Rios v. Colvin, No. 15-30190, 2016 WL 7468802, at *9 (D. Mass. Dec. 28, 2016) ("Although Plaintiff points to medical records that mention fibromyalgia or polyarthralgia, she did not present the ALJ or this court with a diagnosis of either condition from an 'acceptable medical source.'").  Moreover, the argument runs, the ALJ considered Plaintiff's claims of "fibromyalgia-type symptoms such as chronic and diffuse pain and imposed limitations consistent with her complaints." (Dkt. No. 23 at 14.)  According to Defendant, Plaintiff's claim of disabling limitations is not consistent with her

daily activities, which included simple meal preparation, folding laundry, and attending (to some extent) to her personal needs.  Further, as the ALJ noted, Plaintiff made quarterly trips to visit her husband in Kentucky, suggesting that her symptoms were not as severe as she claims.

Third, Defendant argues that the ALJ properly found at step five that there were jobs existing in substantial numbers that Plaintiff could perform.  Specifically, although the ALJ failed to mention the environmental limitation in the second and third hypotheticals, none of the jobs identified by the expert involve exposure to any of the limiting environmental conditions listed in the RFC. (Id. at 15.)  Therefore, any error by the ALJ in not including the environmental limitation was harmless.

D.  Analysis

One aspect of this case that needs to be noted at the outset is the appearance, after Plaintiff's initial application for benefits, of medical records confirming the nature and extent of her disability at the time of her application.  Medical records from 2015 attest to diagnoses

of ankylosing spondylitis and fibromyalgia, multiple surgical interventions, and repeat visits to specialists and treatments, particularly for pain management.  (A.R. 1253, 1257, 1258, 1264-65, 1269, 1272, 1275, 1276, 1281, 1283, 1293.)

Even without these later-obtained confirmatory records, it was clear at the time of the hearing that Plaintiff suffered from a variety of ailments afflicting her urologic, musculoskeletal, and autoimmune systems, presenting what Plaintiff's treating physicians described as "a very complicated case."  (A.R. 1264.)  A sampling of the record paints a picture of an individual whose lifestyle was basically defined by pain management: multiple surgeries involving the kidneys and gallbladder, an elaborate regimen of drugs and steroid injections taken for pain, regular emergency room visits and doctors' consults, virtual confinement to home, and marked dependence upon family.

Given a medical history as complex as this one, the ALJ flatly erred in discounting the opinion of Plaintiff's treating physician, especially where he provided a "detailed, longitudinal picture" of Plaintiff's condition.

20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).  Dr. Axelrod's
opinion was based on no fewer than six documented visits
with Plaintiff between December 2013 and January 2015 during
which time her complaints of flank, back, and hip pain were
consistent.  His initial assessment of chronic pain in
December 2013 was followed by a diagnosis of ankylosing
spondylitis in December 2014 as more information was
revealed about Plaintiff's condition and is entirely
consistent with the clinical exams.  Significantly, Dr.
Axelrod's assessment was supported by Plaintiff's other
doctors, including Plaintiff's primary care physician, Dr.
Haller, and her neurologist Dr. Hreib.  (A.R. 730, 745,
1043, 1094.)  In sum, the ALJ clearly erred by giving
reduced weight to Dr. Axelrod's emphatic opinion that
Plaintiff was unable to work.

    To avoid the impact of the treating physician's
conclusions, Defendant falls into cherry picking the record.
For example, Defendant cites negative findings from
diagnostic tests conducted in 2013 or even early 2012 that
are of limited probative value given Plaintiff's evolving

condition.  Defendant notes an "unremarkable" x-ray of
Plaintiff's hips but omits mentioning an MRI performed the
same day which revealed bilateral sacroiliitis. (Dkt. No. 23
at 7, A.R. 1097, 1098.)

The impeachment of Plaintiff's and Dr. Axelrod's
credibility relied on minor or peripheral details, such as
Plaintiff's use of a cane without a prescription,[4] her
occasional physical examinations showing full strength, her
quarterly visits to Kentucky to visit her husband, her
ability to prepare herself basic meals like cereal and
sandwiches.  These factors are outweighed by the remainder
of the record.  It is well established that complex pain
syndromes are not always accompanied by muscle weakness, and
they can be disabling in its absence, a point the ALJ did
not address.

The ALJ compounded his error in failing to give weight
to the treating physician's opinion by posing hypotheticals

---

[4]  In fact, on February 25, 2016, Plaintiff obtained a
prescription for use of the cane.  This evidence was
submitted to the Appeals Council on March 15, 2016, prior to
the rendering of its final decision on September 13, 2016.
(Dkt. No. 16-2 at 7-8.)

materially less restrictive than those found in the ALJ's ultimate decision. Even assuming the propriety of disregarding Dr. Axelrod's opinion that Plaintiff could not perform work requiring her to climb ramps and stairs, stoop, or tolerate occasional exposure to extreme environmental conditions, the ALJ should have explained why, given Plaintiff's degenerative spinal disease, he eliminated the restriction on stooping. Moreover, as noted, the environmental restrictions posed in the first hypothetical were inexplicably missing from the second and third. (A.R. 57.) Finally, the vocational expert's testimony, in response to hypotheticals four and five, that an employer would not tolerate a worker's sustained absence at least twice a month for medical reasons, or daily hour-long breaks for rest or pain control, was given no consideration in the ALJ's opinion. (A.R. 106.)

## IV. CONCLUSION

For the reasons detailed above, Plaintiff's motion for judgment on the pleadings is hereby ALLOWED (Dkt. No. 17) and Defendant's motion is DENIED. (Dkt. No. 22). This case

is hereby remanded for proper consideration before a different ALJ of the treating physician's opinion.  In making this analysis, the new ALJ should consider recently submitted medical records, which shed light on Plaintiff's condition at the time of her initial application.

It is So Ordered.


   /s/ Michael A. Ponsor
  **MICHAEL A. PONSOR**
  **U.S. DISTRICT JUDGE**